IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JAMES LEE KEITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:20-cv-00521 |
| | ) | |
| VOLVO GROUP NORTH AMERICA, | ) | By: Elizabeth K. Dillon |
| LLC, | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

James Lee Keith alleges claims against Volvo Group North America, LLC for discrimination, failure to accommodate, and interference in violation of the Americans with Disabilities Act (ADA).   Keith claims disability due to injuries arising out of a serious car accident.

Volvo moves for summary judgment.   (Dkt. No. 25.)   The court will grant Volvo's motion for summary judgment because Keith is judicially estopped from from pursuing his ADA claims.   Even if he were not estopped, Keith cannot prevail because, as a matter of law, he is not a qualified individual with a disability under the ADA, he cannot prove that Volvo discriminated against him because of his disability, and he cannot prove a valid claim for failure to accommodate or interference under the ADA.

## I.   BACKGROUND

### A.   Volvo's NRV Plant

Volvo operates a heavy truck manufacturing facility in Dublin, Virginia, known as the New River Valley (NRV) Plant.   (Decl. of Thomas Elswick (Elswick Decl.) ¶ 2, Dkt. No. 26-1.)

The NRV Plant is a unionized facility.   Production employees at the NRV Plant are

represented by Local 2069 of the United Auto Workers (UAW), and the terms of their

employment are governed by a Collective Bargaining Agreement (CBA).   (Elswick Decl. ¶ 3.)

The pertinent CBA for this lawsuit was in effect from 2016 through 2021.   (Dep. of James Keith

(Keith Dep.) at 48–49, Dkt. Nos. 26-2, 27-1; Elswick Decl. ¶ 3.)

Pursuant to the CBA, employees who are unable to work for medical reasons are

entitled to take sick leave upon presentation of supporting medical documentation.   (Elswick

Decl. ¶ 4.)   While on sick leave, the employee is entitled to receive Sickness & Accident

benefits, which provide the employee with 60 percent of his or her regular pay for up to fifty-two

(52) weeks.   (Keith Dep. 56; Elswick Decl. ¶ 4.)   An employee who is unable to return to work

after being on sick leave for twenty-six (26) weeks must apply for long-term disability (LTD)

benefits through the Social Security Administration and through Volvo's LTD benefits provider.

(Keith Dep. 64; Elswick Decl. ¶ 4.)

For an employee to be eligible for LTD benefits under the CBA, the employee "must be

totally disabled so as to be unable to engage in any regular employment or occupation with the

Company by reason of any medically demonstrable physical or mental condition at the plant in

any job that is contractually available to the employee."   (Elswick Decl. ¶ 5.)

To return to work following sick leave, the CBA states that the employee "must present

written evidence from his personal physician that he is able to return to full time regular work

and/or he must be approved to return to work by the Company medical department before he will

be allowed to commence work.   Employees returning to work shall return in the same

classification and department if their seniority and restrictions permit."   (*Id.* ¶ 6.) Volvo is

required to follow the terms of the CBA when returning employees to work following sick leave.

(Keith Dep. 50.)

Available positions at the NRV Plant are filled through a job bid process.  (*Id.* at 78-79; Elswick Decl. ¶ 7.)  Qualified employees must place a bid on open positions, and the CBA dictates that the positions are filled based upon employee seniority.  (Elswick Decl. ¶ 7.) Employees who are out of work on sick leave or LTD must be released to return to work and have a return-to-work date before they can be awarded any job bid at the NRV plant. (Dep. of Greg Shank, Dkt. No. 26-3 (Shank Dep.), at 31-32; Elswick Decl. ¶ 7.)

**B.  Plaintiff's Employment at Volvo**

Plaintiff began work at Volvo's NRV Plant on June 3, 1997.  (Keith Dep. 27.)  Plaintiff joined Local 2069 of the UAW.  (*Id.* at 45.)

In 2011, plaintiff was working in an hourly production position in the Assembly area at the NRV Plant.  (*Id.* at 59-60; Keith Dep. Ex. 9.)  In September of that year, plaintiff suffered serious injuries in a non-work-related vehicle accident.  (Keith Dep. 69-70.)  Plaintiff injured his left hip and foot, and he also suffered significant internal injuries that resulted in the removal of part of his intestines and left a large wound on his stomach.  (*Id.* at 70-71.)  Following this accident, plaintiff was placed on sick leave by Volvo and received Sickness & Accident benefits. (*Id.* at 72.)  Initially, one of his wounds did not heal properly, and he was treated by Dr. Benjamin Davis, a wound care specialist in Roanoke, Virginia.  (*Id.* at 73-74; Dep. of Dr. Benjamin Davis , Dkt. No. 26-4 (Davis Dep.), at 19-21.)

Plaintiff was released to return to work in May 2012.  Pursuant to the CBA, Volvo returned plaintiff to a position in the Assembly area.  (Keith Dep. 60-61, 73; Keith Dep. Ex. 9.) Following his return to work, plaintiff was placed in a light-duty position in the Assembly area.

(Keith Dep. 61.)   Plaintiff remained in a light-duty position until March 2014, when plaintiff's light-duty position was eliminated by Volvo.   (*Id.* at 62-64; Shank Dep. 12.)   Plaintiff was put back on sick leave in March 2014 and again received Sickness & Accident benefits.   (Keith Dep. 75.)

**C.   Plaintiff's Long-Term Disability Benefits**

On September 9, 2014, plaintiff completed an application for LTD benefits through Volvo's provider, The Hartford.   (Hartford Docs. 1643-48, Dkt. No. 26-5.)   In making that application, plaintiff certified that he had not actively worked since March 28, 2014, and that he was unable to perform any job at the NRV Plant that was contractually available to him.   (*Id.* at 1645-48.)   Plaintiff's application for LTD benefits was supported by a statement from Dr. Daniel Tershak stating that plaintiff was limited to standing and walking for three (3) hours and that he was limited to pushing and pulling no more than twenty (20) pounds.   (*Id.* at 1599.)

On February 20, 2015, The Hartford determined that plaintiff was totally disabled within the meaning of the CBA and awarded him LTD benefits.   (*Id.* at 193-95.)   This determination states that plaintiff is "totally disabled" meaning that he was "unable to engage in any regular employment or occupation by reason of any medically demonstrable physical or mental condition with the Company at the Plant or Plants where the employee works."   (*Id.* at 193.)

On August 17, 2018, plaintiff completed a Claimant Questionnaire in which he provided updated information to The Hartford regarding the status of his disability.   (*Id.* at 975-78.).   In that document, plaintiff again certified that he was totally disabled and specifically indicated that he did not expect to be engaged in any work activity, including self-employment.   (*Id.* at 975-

78.)

Since March 2014, plaintiff has not worked at all.   (Keith Dep. 75.)   Plaintiff continues

to receive LTD benefits through the Social Security Administration and The Hartford.

(*Id.* at 34-36.)

**D.   Plaintiff's Attempts to Return to Work at Volvo as an Engineering Technician**

In December 2017, plaintiff learned from a friend who worked at Volvo, Matt Wickline,

that Volvo had posted open positions on the third shift in the Plastic Paint Department in Body in

White at the NRV Plant.   (*Id.* at 76-77.)

On December 14, 2017, Wickline submitted a first choice bid form on behalf of plaintiff

for the position of Engineering Technician on third shift in the Plastic Paint Department in Body

in White.   (*Id.* at 80-81; Keith Dep. Ex. 10.)   On December 21, 2017, Wickline submitted a

second choice bid form on behalf of plaintiff for the position of Material Handler on third shift in

the Plastic Paint Department.   (Keith Dep. 81-82; Keith Dep. Ex. 10.)   Volvo did not consider

either of these bids that were submitted on behalf of plaintiff by Wickline because plaintiff was

out of work on LTD and had not been released to return to work.   (Elswick Decl. ¶ 8.)

In January 2018, after learning that he did not receive either of the jobs on which he had

bid, plaintiff contacted Cindy Robertson, the employee in the Human Resources Department at

the NRV Plant responsible for the job bid process.   (Keith Dep. 77, 83.)   Robertson informed

plaintiff that he was not eligible to receive a bid because he was out of work on LTD and had not

provided a release to return to work.   (*Id.* at 83–84.)

After talking with Robertson, plaintiff then contacted Greg Shank, the UAW hourly

bargaining chairman at the NRV Plant.   (*Id.* at 84-85.)   Shank confirmed that plaintiff needed to

be released to return to work and have a return to work date before he could be awarded any job bids.   (*Id.*; Shank Dep. 31-32.)

On January 19, 2018, Dr. Davis, plaintiff's wound care specialist, completed a Physical Capabilities Checklist (PCC) form.   (Keith Dep. 91; Keith Dep. Ex. 11.)   In late January 2018, plaintiff submitted the January 19 PCC form to Volvo.   (Keith Dep. 95.)   According to Dr. Davis' statements in the January 19 PCC, Keith was capable of "constant" driving, use of vibrating tools, gripping and grasping, keyboard operation, and foot controls.   (Keith Dep. Ex. 11.)   He could "frequent[ly]," defined as up to 66 percent of the time, lift waist to shoulder and shoulder height to higher, sit, stand, walk, climb and push.   (*Id.*)   Keith's most significant limitations were that he could lift from floor to waist, bend, twist, stoop, squat, pull, and crawl, less than 33 percent of the time.   (*Id.*)   Dr. Davis restricted Keith to a twenty-pound weight limit.

Plaintiff was contacted by Pam Bratton, a Human Resources Business Partner at the NRV Plant.   Bratton asked plaintiff to meet with Dr. Matthew Kaatz, the doctor at the NRV Plant. (Keith Dep. 95.)   Plaintiff met with Dr. Kaatz and agreed with him that plaintiff could not perform any jobs in the Assembly area with his physical restrictions.   (*Id.* at 95-96.)   Plaintiff told Dr. Kaatz that he thought he could perform the Engineering Technician position in Body in White with his restrictions.   (*Id.* at 96.)   Dr. Kaatz indicated that Volvo would look into it. (*Id.*)

The medical information provided by plaintiff was reviewed by a team in the Medical Department at the NRV Plant which determined that plaintiff could not perform the essential functions of any available jobs given his physical restrictions.   (Declaration of Pamela Bratton,

Dkt. No. 26-6 (Bratton Decl.) ¶ 3.)   Dr. Kaatz agreed with this determination.   (*Id.*)   Plaintiff

was subsequently informed that there were no jobs at the NRV Plant that he could perform with

those restrictions.   (Keith Dep. 97.)

On January 28, 2018, Elswick spoke with plaintiff and suggested that plaintiff might be

able to do a forklift job.   (Pl. Ex. 4, Dkt. No. 27-4.)   Plaintiff agreed that a forklift job was a

possibility but told Elswick that he was interested in the Engineering Technician job he bid on in

December.   (*Id.*)   Plaintiff told Elswick that but for his placement on LTD, he would have

gotten the position because of his seniority with the company.   (*Id.*)   Elswick said he would

look into Keith's seniority status.   (*Id.*)

On February 8, 2018, plaintiff was told by Wickline that two Engineering Techs on

second shift in Body in White were leaving.   (*Id.*)   Plaintiff contacted Ivan Snell, a committee

person in the UAW, to request his assistance in landing one of those vacated positions.   (*Id.*)

Snell agreed that these soon-to-be-available positions would fit plaintiff's limitations.   (Pl. Ex.

5, Dkt. No. 27-5.)   Elswick told Snell that Keith needed to wait until Elswick had time to look at

Keith's seniority.   (Pl. Ex. 4.)

In May 2018, plaintiff once again met with Elswick about returning to work.   (Keith

Dep. 99; Elswick Decl. ¶ 9.)   Plaintiff told Elswick that he was out on LTD but that he was

interested in returning to work.   (Elswick Decl. ¶ 9.)   Plaintiff stated that he did not think he

could do the job in Assembly that he previously held but thought he could work as an

Engineering Technician in the Plastic Paint Department.   (Elswick Decl. ¶ 9.)   Elswick

provided plaintiff with an accommodations questionnaire for the Engineering Tech position and

told him to have his doctor fill out the questionnaire and provide a release to return to work with

any restrictions that he had.   (Keith Dep. 99-100; Elswick Decl. ¶ 9.)   The accommodations

questionnaire stated as follows:

> In the Engineering Tech position, an employee must be able to bend,
> stoop, squat, twist, climb, Push/Pull up to 50 pounds, lift up to 50
> pounds and stand for extended periods of time, generally speaking.
> You have indicated that with your lack of stomach muscles some of
> the essential functions may be an issue. Therefore, we would like to
> know whether you need an accommodation to perform the essential
> functions of the Engineering Tech Position. Please give your
> healthcare provider this letter and ask them to provide answers to
> the questions below.

(Keith Dep. Ex. 13.)   Plaintiff admitted that those were the physical requirements for the

Engineering Technician position.   (Keith Dep. 104.)

On May 16, 2018, Dr. Davis completed the accommodations questionnaire and another

PCC form.   (Keith Dep. 102; Keith Dep. Exs. 12, 13.)   On that PCC form, Dr. Davis stated that

plaintiff had no physical restrictions other than a twenty pound lifting restriction. (Keith Dep. Ex.

12.)

Plaintiff returned the May 16 PCC form and accommodations questionnaire to Elswick.

(Keith Dep. 105; Elswick Decl. ¶ 10.)   After reviewing the completed forms, Elswick contacted

plaintiff and stated that he could return to his previous job in the Assembly area at the NRV Plant

since he did not have any physical restrictions other than the lifting restriction.   (Keith Dep.

105-06; Elswick Decl. ¶ 10.)   Plaintiff responded that he really did have restrictions and that he

was physically unable to do a job on the assembly line.   (Keith Dep. 106, 111; Elswick Decl. ¶

10.)   Elswick told plaintiff that if he believed he still had physical restrictions, then the form

submitted by his doctor was not accurate.   (Elswick Decl. ¶ 10.)   He asked plaintiff to submit

an accurate medical assessment from his doctor so Volvo could evaluate whether he could return

to work with his restrictions.   (Keith Dep. 112; Elswick Decl. ¶ 10.)

On June 11, 2018, Dr. Davis completed another PCC form on behalf of plaintiff.   (Keith Dep. 114; Keith Dep. Ex. 14.)   The June 11 PCC form contained physical restrictions very similar to the restrictions included on the January 19 PCC form.   (Keith Dep. 114; Keith Dep. Exs. 11, 14.)   Plaintiff agreed with the physical restrictions that Dr. Davis placed on him. (Keith Dep. 117.)

Elswick provided the June 11 PCC form and accommodations questionnaire to Melissa Roope, an Employee Health Nurse at the NRV Plant.   (Elswick Decl. ¶ 11; Declaration of Melissa Roope, Dkt. No. 26-7 (Roope Decl.) ¶ 7.)   Elswick told Roope that plaintiff had expressed interest in returning to work in an Engineering Technician position in the Plastic Paint Department.   (Elswick Decl. ¶ 11; Roope Decl. ¶ 7.)   Elswick asked the NRV Plant Medical Department to evaluate whether plaintiff could perform the essential functions of that position with the restrictions provided by his doctor on the June 11 PCC form.   (Elswick Decl. ¶ 11; Roope Decl. ¶ 7.)

Roope first met with plaintiff's supervisor in the Assembly area and determined that plaintiff was unable to perform the essential functions of his previous job in Assembly with the restrictions placed on him by Dr. Davis.   (Roope Decl. ¶ 8.)   Roope then evaluated whether plaintiff could perform the specific position that plaintiff had requested.   (*Id.* ¶ 9.)   To evaluate that position, Roope went out to the Plastic Paint Department with Destry Harding, the supervisor in that area, and Jody Akers, the UAW representative who had responsibility for that area, to observe the job duties being performed by the Engineering Technicians.   (*Id.*)   Roope also personally spoke with Engineering Technicians in that area to better understand of the duties

9

of the position.   (*Id.*)

Roope determined that based on the physical restrictions placed on him by Dr. Davis, plaintiff was unable to perform the essential functions of the Engineering Technician position, with or without a reasonable accommodation.   (*Id.* ¶ 11.)   Specifically, she found that the Engineering Technician positions in the Plastic Paint Department required standing and walking 100 percent of the time and repetitive bending.   (*Id.*)   All of these physical requirements were prohibited by Dr. Davis.   (*Id.*; Keith Dep. Ex. 14.)   Roope notified Elswick of her findings. (Elswick Decl. ¶ 12; Roope Decl. ¶ 12; Roope Decl. Ex. B.)

After receiving the results of the evaluation from Roope, Elswick contacted plaintiff and informed him that he could not perform the essential functions of the Engineering Technician position with the restrictions placed on him by Dr. Davis.   (Keith Dep. 118-19; Elswick Decl. ¶ 12.)   Plaintiff testified that Elswick informed him that Dr. Davis had restricted him too much in standing and walking to be able to do the Engineering Technician job.   (Keith Dep. 119.) Plaintiff contacted Dr. Davis and asked him to revise the physical restrictions on the PCC form to allow him to stand and walk 100 percent of the time.   (*Id.* at 123.)   On June 22, 2018, plaintiff faxed a revised version of the June 11 PCC form to Volvo.   (Keith Dep. Ex. 15.)   On that revised form, Dr. Davis changed the restriction for standing and walking as requested by plaintiff.   (Keith Dep. 123; Keith Dep. Ex. 15.)   However, all of the other physical restrictions remained the same as on the original June 11 PCC form.   (Keith Dep. Exs. 14, 15.)   Therefore, Volvo determined that plaintiff was still unable to perform the Engineering Technician job.

Plaintiff last communicated with Mr. Elswick about returning to work in July 2018. (Keith Dep. 124, 126.)   During that conversation, Elswick informed plaintiff that all available

Engineering Technician positions in the Plastic Paint Department had been filled.   (*Id.*; Elswick

Decl. ¶ 14.)   Plaintiff testified that his physical restrictions have not changed since June 2018.

(Keith Dep. 129.)

**E.   EEOC Proceedings and Federal Complaint**

On October 18, 2018, plaintiff filed a Charge of Discrimination with the U.S. Equal

Employment Opportunity Commission alleging that Volvo discriminated against him based on

his alleged disability and refused to reasonably accommodate his alleged disability.   (Keith

Dep. Ex. 17.)   Missing from this charge was any allegation of an interference claim.   He

received a Notice of Right to Sue from the EEOC on or about June 2, 2020.   (Keith Dep. Ex.

18.)

Plaintiff filed this lawsuit on August 29, 2020, asserting   three causes of action under the

Americans with Disabilities Act ("ADA"): 1) discrimination, 2) failure to accommodate, and 3)

interference.   (Compl., Dkt. No. 1.)

## II.   ANALYSIS

**A.   Summary Judgment Standard**

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed.

R. Civ. P. 56(a).   The party seeking summary judgment "bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of [the

record] which it believes demonstrate the absence of a genuine issue of material fact."   *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   Once the moving party has met its burden, the non-

moving party must the "come forward with specific facts showing that there is a genuine issue

for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Only disputes between the parties over facts that might affect the outcome of the case properly

preclude the entry of summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the

suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for

the non-moving party).

In determining whether there is a genuine issue for trial, "evidence of the non-movant is

to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor."  *Id.* at

255.   Nevertheless, "permissible inferences must still be within the range of reasonable

probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the

necessary inference is so tenuous that it rests merely upon speculation and conjecture."

*Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241 (4th Cir. 1982).   Thus, judgment as a

matter of law is warranted where "the verdict in favor of the non-moving party would necessarily

be based on speculation and conjecture."  *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485,

489 (4th Cir. 2005).   By contrast, when "the evidence as a whole is susceptible of more than one

reasonable inference, a [triable] issue is created," and judgment as a matter of law should be

denied.  *Id.* at 489–90.

## B.  Plaintiff is Judicial Estopped from Pursuing His ADA Claims

Before reaching the merits of plaintiff's ADA claims, defendant argues that plaintiff is

judicially estopped arguing that he is a qualified individual with a disability due to his

application for long-term disability benefits.   Under the ADA, an employer may not

"discriminate against a qualified individual on the basis of disability."   42 U.S.C. § 12112(a).

A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8).   Essential functions, in turn, are "functions that bear more than a marginal relationship to the job." *EEOC v. Womble Carlyle Sandridge & Rice, LLP*, 616 F. App'x 588, 593 (4th Cir. 2015) (citing *Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209, 213 (4th Cir. 1994)); *see* 29 C.F.R. § 1630.2(n)(1)–(3).   The Supreme Court has held that a plaintiff's "sworn assertion in an application for disability benefits that she is, for example, 'unable to work' will appear to negate an essential element of her ADA case," i.e., that she is a qualified individual with a disability—a person who, with or without reasonable accommodation, can perform the essential functions of her job.   *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). To avoid summary judgment, an ADA plaintiff "cannot ignore the apparent contradiction that arises out of the" earlier claim; rather, "she must proffer a sufficient explanation."   *Id.*   "To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential funcitons' of her job, with or without 'reasonable accommodation.'"   *Id.*   In other words, plaintiff has the burden to explain the contradiction between statements in his disability benefits application and his claim for relief under the ADA.   *See Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001).

Plaintiff applied for LTD benefits in 2014.   In 2015, The Hartford determined that plaintiff was "totally disabled" because he was "unable to engage in any regular employment or occupation by reason of any medically demonstrable physical or mental condition with the Company at the Plant or Plants where the employee works."   (Hartford Docs. 193.)   On August

17, 2018, plaintiff again certified that he was totally disabled and specifically indicated that he did not expect to be engaged in any work activity, including self- employment.   (*Id.* at 975-78.) This would seem to preclude the possibility that plaintiff could prove, with or without reasonable accommodation, that he can perform the essential functions of his job.   Indeed, plaintiff's certifications in 2014 and 2018 contradict plaintiff's claim and argument in this lawsuit that he was a qualified individual with a disability during that same time period.

Plaintiff attempts to explain the discrepancy by arguing that he applied for LTD benefits in September 2014 at Volvo's "instigation."   (Pl.'s Br. 15, Dkt. No. 27.)   In those certifications, plaintiff attested that he was disabled because there was no work for which he was physically qualified.   In other words, plaintiff's assertions of disability were made relative to particular positions, but when he saw a position that was not physically demanding, plaintiff claims he was qualified for those positions, such as the Engineering Tech position that he wanted.   However, the interactive process between Volvo and plaintiff demonstrated that plaintiff could not perform the essential functions of the Engineering Tech position.   Therefore, plaintiff has not met his burden to explain the contradiction between his LTD application and his ADA claim.   *See, e.g.*, *Allen v. Michelin N. Am., Inc.*, Civil Action No. 6:18-cv-791-TMC, 2020 WL 7332907, at *5 (D.S.C. Dec. 14, 2020) (finding ADA claims judicially estopped where plaintiff stated that she was "unable to work" in her applications for long-term disability and social security benefits).

Based on this analysis, plaintiff is estopped from pursuing his ADA claims.   Even so, the court will address them below.

## C.  Even If Not Estopped, Plaintiff Is Not A Qualified Individual

As noted above, the term "qualified individual" is defined as "an individual who, with or

14

without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A "reasonable accommodation" is defined to include "making existing facilities used by employees readily accessible to and usable by individuals with disabilities," as well as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." *Id.* § 12111(9). Thus, the definition of qualified individual with a disability "includes employees who could perform the essential functions of a reassignment position, with or without a reasonable accommodation, even if they cannot perform the essential functions of their current position." *Easton v. Aberdeen Police Dep't*, No. SAG-19-3650, 2020 WL 6390656, at *1 (D. Md. Oct. 27, 2020) (citing *Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 633 (6th Cir. 1999)).

Plaintiff concedes that he was unable to perform, with or without accommodation, the essential functions of his previous position on the Assembly Line with the restrictions placed on him by his doctor. (Keith Dep. 95–96, 106, 111.) Plaintiff, however, maintains that he is a qualified individual with a disability with respect to the Engineering Technician position. Plaintiff bears the burden of proving that he was qualified to perform the essential functions of that position. *See Shin v. Univ. of Md. Med. Sys. Corp.*, 369 F. App'x 472, 481 (4th Cir. 2010).

The ADA specifically identifies two factors that inform whether a particular function is essential to a position. First, an employer's judgment of essential functions must be considered. 42 U.S.C. § 12111(8). Second, if a written job description was prepared ahead of advertising or

interviewing candidates for the job, that description "shall be considered evidence of the essential functions of the job."   *Id.*   Regulations also provide guidance, identifying seven factors as evidence of an essential function: (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) amount of time spent on the job performing the function; (4) consequences of not requiring the incumbent to perform the function; (5) terms of a collective bargaining agreement; (6) work experience of past incumbents in the job; and (7) current work experience of incumbents in similar jobs.   29 C.F.R. § 1630.2(n)(3).   None of these factors are dispositive, and not all will necessarily be relevant in a given matter.   *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 579 (4th Cir. 2015).   The list is also not exhaustive.   29 C.F.R. § 1630.2(n)(3).

The essential functions of the Engineering Technician position, according to Volvo, include bending, stooping, squatting, twisting, climbing, pushing/pulling up to 50 pounds, lifting up to 50 pounds, and standing for extended periods of time.   (Keith Dep. Ex. 13.)   On June 11, 2018, plaintiff's doctor completed a PCC form stating that plaintiff had significant physical restrictions, including limitations on lifting, standing, walking, bending, squatting, crawling, pushing, and pulling.   (Keith Dep. Ex. 14.)   Ms. Roope, the nurse at the NRV Plant, conducted an evaluation and determined that plaintiff was unable to perform the essential functions of the Engineering Technician position with or without a reasonable accommodation.   She found that the position required standing and walking 100 percent of the time as well as repetitive bending. (Roope Decl. ¶ 11, Ex. B.)   Plaintiff agreed that these were the essential functions of the

Engineering Tech position.[1]   Therefore, plaintiff is not a qualified individual with a disability.

Plaintiff argues that these essential functions, which were included on the PCC form and accommodations questionnaire, are contradicted by a ten-page list of Essential Functions and Required Physical Demands for the Engineering Tech job.   (*See* Ex. 25, Dkt. No. 27-25.)   This document was created in 2020, two years after plaintiff demanded to be placed in the Engineering Technician position.   Written job descriptions are typically relevant only if prepared "before advertising or interviewing applicants for the job."   29 C.F.R. 1630.2(n)(3)(ii). Moreover, the document states that Engineering Technicians will have to occasionally lift up to 39.9 pounds.   While this is less than the 50 pound requirement on plaintiff's PCC form and accommodations questionnaire, it is still more than the 20 pound limitation provided by Dr. Davis.   (Keith Dep. Ex. 12.)   Therefore, even assuming that the ten-page "Essential Functions"

---

[1] Plaintiff testified at his deposition as follows:

> Q.   Now, the very first sentence of this document talks about the requirements of the Engineering Tech position.
>
> A.   Yes, sir.
>
> Q.   It says, "Employee must be able to bend, stoop, squat, twist, climb, push/pull up to 50 pounds, lift up to 50 pounds and stand for extended periods of time, generally speaking."
>
> A.   That's right.
>
> Q.   Was that your understanding of the requirements of that job.
>
> A.   Yes.
>
> And I talked to Chase about that and then he gave me this because I told him, I said I believe—if I remember correctly, I told him, I said, "If you expect me to pick up 50 pounds," I said, "I might as well not even take the paperwork."   And he said it was just generally speaking.   I said, "No doctor is going to let me pick up 50 pounds.   It's not going to happen."

(Keith Dep. 104.)

document is relevant, plaintiff would still be unable to perform the essential functions of the Engineering Tech job.

Finally, plaintiff cites the opinions and comments of certain co-workers and a Hartford claims representative about the physical demands of the Engineering Tech position and plaintiff's purported ability to perform that job.   Many of these statements are unverified, (*see* Dkt. Nos. 27-13 (statement of Lisa Hufford), 27-27 (statement of Sherman McDaniel), 27-28 (statement of Ivan Snell)); such statements cannot be used to create a genuine dispute of fact. *See Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993) ("It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment."); *Jones v. Alvarez*, 1:19CV930, 2022 WL 2440437, at *3 (M.D.N.C. July 5, 2022) ("Although Plaintiff has signed the statement, it was not signed under penalty of perjury, making it equivalent to an unverified complaint.   To survive summary judgment, Plaintiff cannot rest on unverified statements to create a genuine dispute of fact.").   Moreover, the testimony offered from these witnesses contradicts plaintiff's admission that the position required lifting up to 50 pounds. *See, e.g.*, *Williams v. Genex Servs., LLC*, 809 F.3d 103, 110 (4th Cir. 2015) ("It is well-settled that a plaintiff may not avoid summary judgment by submitting contradictory evidence."). Furthermore, the court has no information concerning the qualifications of these people to opine on the daily requirements of the Engineering Tech position and plaintiff's ability to satisfy those requirements.

For these reasons, there are no genuine issues of fact on the issue of plaintiff being a qualified individual with a disability, and as a result, Volvo is entitled to summary judgment.

**D.  Plaintiff Cannot Establish A Disability Discrimination Claim**

To establish a prima facie case of disability discrimination, plaintiff must show (1) he is a qualified individual with a disability, (2) he suffered an adverse employment action, (3) he was meeting his employer's legitimate expectations at the time of the adverse employment action, and (4) the circumstances of the adverse employment action raise a reasonable inference of unlawful discrimination.  *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012). When, as here, the plaintiff proceeds with circumstantial rather than direct evidence, the *McDonnell Douglas* burden-shifting framework governs an ADA discrimination claim.  *See Coffey v. Norfolk S. Ry. Co.*, 23 F.4th 332, 336 (4th Cir. 2022) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).   Under that framework, if a plaintiff establishes a prima facie case of discrimination, the burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory, non-retaliatory justification for taking the employment action at issue.  *Hannah P. v. Coats*, 916 F.3d 327, 347 (4th Cir. 2019).   If defendant meets this burden, the burden then shifts back to the plaintiff, who must demonstrate that the defendant's stated reasons are pretextual.  *Id.*

Plaintiff cannot establish a prima facie case of discrimination because, for the reasons the court has already discussed, he is not a qualified individual with a disability.   Even if plaintiff could establish a prima facie case, Volvo had a legitimate, non-discriminatory reason for not placing plaintiff in the Engineering Tech position—plaintiff was unable to perform the essential functions of that position given his doctor-imposed physical limitations.   Plaintiff has not shown that this reasoning was a pretext.

**E.   Plaintiff Cannot Establish A Failure to Accommodate Claim**

In order to demonstrate a prima facie case of failure to accommodate, plaintiff must

allege: (1) that he was an individual who had a disability within the meaning of the statute; (2)

that the employer had notice of his disability; (3) that with reasonable accommodation he could

perform the essential functions of the position, essentially that plaintiff is a "qualified individual"

under the statute; and (4) that the employer refused to make such accommodations.   *Wilson v.*

*Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013).   Where an employee communicates to his

employer his disability and a desire for an accommodation, the employer has a duty to engage in

the interactive process to identify a reasonable accommodation.   *Id.* at 347.   The ADA

regulations further provide that this process "should identify the precise limitations resulting

from the disability and potential reasonable accommodations that could overcome those

limitations."   29 C.F.R. § 1630.2(o)(3).

Once again, plaintiff cannot prove a prima facie case for failure to accommodate because

he is not a qualified individual with a disability.   Volvo has also accommodated plaintiff by

allowing him to remain out of work on paid sick leave and LTD.   *See Wilson*, 717 F.3d at 345

(stating that a reasonable accommodation may involve "the use of accrued paid leave or

providing additional unpaid leave"); *Frazier v. Donahoe*, Case No.:PWG-14-3974, 2016 WL

1045853, at *7 (D. Md. Mar. 15, 2016) ("Where an employee is unable to perform the essential

functions of his or her job, permitting that employee to use annual or sick [leave] while the

situation is resolved is a reasonable accommodation.").   Further, while a reasonable

accommodation may include reassignment to a different job position, plaintiff in this case acted

as if there was only one accommodation that he wanted—placement in the Engineering Tech

position.   Plaintiff expressly refused an offer to return to his old Assembly Line position.

Plaintiff is not entitled to a specific, desired position—only an accommodation that is reasonable.

*See, e.g.*, *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 323 (4th Cir. 2011);

*Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480, 484 (8th Cir. 2007) ("[A]n employer is not

required to provide a disabled employee with an accommodation that is ideal from the

employee's perspective, only an accommodation that is reasonable."); *Jackson v. FUJIFILM*

*Mfg. USA, Inc.*, C.A. No. 8:09-cv-01328-JMC, 2011 WL 494281, at *2 (D.S.C. Feb. 7, 2011)

("Although Plaintiff did not receive the work assignment he desired, there is nothing in the

record to demonstrate that Defendant did not attempt to make a reasonable accommodation for

Plaintiff.")

Plaintiff also claims that Volvo did not engage in an honest interactive process to

determine appropriate accommodations.   To the contrary, the record demonstrates that Volvo

repeatedly engaged with plaintiff about the accommodating his disability.   Plaintiff discussed

the issue with Elswick and Dr. Kaatz and filled out several forms related to his physical

capabilities that were provided by Volvo.   In addition, "an employee cannot base a reasonable

accommodation claim solely on the allegation that the employer failed to engage in an interactive

process.   Rather, the employee must demonstrate that the employer's failure to engage in the

interactive process resulted in the failure to identify an appropriate accommodation for the

disabled employee." *Crabill*, 423 F. App'x at 323 (citing *Rehling v. City of Chi.*, 207 F.3d

1009, 1016 (7th Cir. 2000)).   Plaintiff cannot make this showing because he has been

accommodated with sick leave and LTD benefits.[2]   The interactive process also resulted in the

---

[2] Plaintiff is still a Volvo employee, and he continues to receive LTD benefits, health insurance benefits, and retirement benefits.   (Keith Dep. 28, 34–38.)

reasonable accommodation of Volvo offering plaintiff reinstatement to his former position, which plaintiff refused.

For these reasons, Volvo is entitled to summary judgment on plaintiff's accommodation claim.

## F. Plaintiff Cannot Establish An ADA Interference Claim

Plaintiff alleges that Volvo interfered with his rights under the ADA.   As an initial matter, plaintiff failed to exhaust his administrative remedies prior to filing this claim in federal court.   "Administrative exhaustion requires the party complaining of discrimination to file a charge with the EEOC, which serves the dual purpose of 'ensuring that the employer is put on notice of the alleged violations, thereby giving it a chance to address the alleged discrimination prior to litigation,' and of 'encouraging quicker, less formal, and less expensive resolution' of the dispute via the administrative process."   *Reeves v. Dimensions Health Corp.*, Case No.: PWG 21-cv-1674, 2022 WL 3599140, at *4 (D. Md. Aug. 23, 2022) (quoting *Sydnor v. Fairfax Cnty., Va.*, 681 F.3d 591, 593 (4th Cir. 2012)).   Plaintiff did not allege interference in his discrimination charge before the EEOC.   (Keith Dep. Ex. 17.)   Even if plaintiff had exhausted his administrative remedies, his interference claim can be dismissed on its merits.

To prevail on a claim for ADA interference, plaintiff must show: (1) he engaged in an activity that is statutorily protected by the ADA; (2) he was engaged in, or aided or encouraged others in, the exercise or enjoyment of ADA protected rights; (3) defendant coerced, threatened, intimidated, or interfered on account of plaintiff's protected activity; and (4) defendants were motivated by an intent to discriminate.   *Sowers v. Bassett Furniture Indus., Inc.*, Civil Action No. 4:19cv00039, 2021 WL 276169, at *9 (W.D. Va. Jan. 27, 2021) (citing *Frakes v. Peoria*

22

*Sch. Dist. No. 150*, 872 F.3d 545, 550–51 (7th Cir. 2017)).   Plaintiff alleges that Volvo interfered with his ADA rights by not accommodating his disability.   (*See* Compl. ¶¶ 57–67.) This is simply another version of plaintiff's failure to accommodate claim.   *See Sowers*, 2021 WL 276169, at *9 (granting summary judgment on an interference claim that is "indistinguishable from a standard failure-to-accommodate claim").

For these reasons, Volvo is entitled to summary judgment on plaintiff's interference claim.

### III.   CONCLUSION

For the foregoing reasons, the court will enter an appropriate order granting Volvo's motion for summary judgment.

Entered: January 18, 2023.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge